**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

TRACY SAMUEL LEE,                    *
MERVYN BIVENS,
BRUCE ANTONIO RICKS,                 *

Plaintiffs,                          *

v.                                   *        Civil Action No. ELH-18-3882
                                              (Related Case No. ELH-19-18)
RICKY FOXWELL, *Warden of ECI*,      *        (Related Case No. ELH-19-56)
ROBERT TROXELL, *CDM*, and
DEPARTMENT OF PUBLIC SAFETY,         *
   AND CORRECTIONAL SERVICES,
                                     *
Defendants.

                        ***

## MEMORANDUM OPINION

This case arises from an isolated error on October 25, 2017, at Eastern Correctional Institution ("ECI"), a State prison in Westover, Maryland. The error resulted in the provision of sausages to inmates at breakfast that contained 2% or less of pork stock.

At the time of the incident, plaintiffs Tracy Samuel Lee, Mervyn Bivens, and Bruce Antonio Ricks were inmates housed at ECI. *See* ELH-18-3882 (Lee Compl.), ECF 1; Case ELH-19-18 (Bivens Compl.), ECF 1; Case ELH-19-56 (Ricks Compl.), ECF 1. They brought separate suits pursuant to 42 U.S.C. § 1983 against ECI Warden Ricky Foxwell, Dietary Manager Robert Troxell, Sr., and the Department of Public Safety and Correctional Services ("DPSCS").[1] Claiming that consumption of pork is against their religion as Sunni Muslims, each plaintiff seeks compensatory and punitive damages for defendants' alleged violation of their First Amendment rights. Additionally, Lee seeks injunctive relief in the form of transfer to another institution. Case

---

[1] Lee and Ricks named Foxwell and Troxell as defendants. ELH-18-3882; ELH-19-56. Bivens originally named Foxwell, DPSCS, and "ECI Dietary" as defendants. ELH-19-18. On January 29, 2019, this court dismissed the suit as to ECI Dietary. *See* ELH-19-18, ECF 6.

ELH-18-3882, ECF 1.

By Order of January 29, 2019, I consolidated plaintiffs' cases. Case ELH-18-3882, ECF 6. And, because Mr. Lee's case was the first of the three to be filed, I designated it as the lead one for filing purposes. *Id.*; *see also* ELH-19-18, ECF 6; ELH-19-56, ECF 8. Hereafter, all citations reflect their electronic pagination in case ELH-18-3882.

Defendants have moved to dismiss or, in the alternative, for summary judgment. ELH-18-3882, ECF 20. The motion is supported by a memorandum of law (ECF 20-1) (collectively, the "Motion") and several exhibits. Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the court informed plaintiffs that the failure to file an opposition to the defendants' Motion could result in dismissal of their suit or judgment against them. ECF 21 (Lee); ECF 22 (Bivens); ECF 23 (Ricks). Bivens and Lee filed responses in opposition to defendants' Motion. ECF 24 (Bivens); ECF 26 (Lee); ECF 27 (Lee). Ricks filed motions for summary judgment. ECF 25; ECF 28. Defendants did not reply.

Upon review of the record, exhibits, and applicable law, the court deems a hearing unnecessary. *See* Local Rule 105.6 (D. Md. 2018). Defendant DPSCS shall be dismissed from suit. Ricks's motions for summary judgment shall be denied. Defendants' Motion shall be construed as a motion for summary judgment as to the remaining defendants and shall be granted.

## I. Factual Background

Plaintiffs state that on October 25, 2017, while incarcerated at ECI, they were served sausages that contained pork. *See* ECF 1 (Lee Complaint); ECF 7 (Bivens Complaint); ECF 12 (Ricks Complaint). Plaintiffs allege that defendants knew the sausages contained pork but decided to serve them nonetheless. *See* ECF 1 at 5; ECF 7 at 2; *see also* ECF 25 at 2. Plaintiffs claim that they are all practicing Sunni Muslims and that consuming pork is against their religion. ECF 1 at

2; ECF 7 at 3; ECF 12 at 2.

As a result of eating the sausages, Bivens claims that he became ill and suffered vomiting, nausea, and diarrhea. ECF 7 at 3. Ricks claims that he began to have stomach pains and vomiting, prompting him to fill out a sick call slip. ECF 12 at 2.

Troxell was the Correctional Dietary Manager at ECI during the relevant time. ECF 20-3 (Troxell Declaration), ¶1. In his Declaration, Troxell states that, in accordance with DPSCS policy, "no prison inmate food items of any kind may contain any pork or pork by-products out of general consideration of established Muslim and Jewish religious dietary restrictions, which forbid consumption of any pork[.]" *Id.* ¶3. Moreover, "[c]ertified Halal and Kosher diets are provided for Muslim and Jewish inmates, respectively, on the basis of widely recognized and established Muslim and Jewish religious convictions." *Id.* ¶4. However, those religious diets are "only provided to inmates who submit a written dietary request and have been approved by the prison chaplain once the chaplain has interviewed them individually to ascertain the veracity and sincerity of their respective religious faiths to warrant accommodation of a religious diet rather than the general population meals." *Id.* Troxell avers that none of the plaintiffs ever submitted a written request for a Halal special diet on the basis of his Muslim faith. *Id.* ¶5.

It is clear that, at the relevant time, the DPSCS did not order sausages with pork. An Invoice dated September 27, 2017, reflects that ECI contracted to purchase 192 cases of turkey maple sausage links from a commercial food vendor. ECF 20-2 (DPSCS Records) at 3. Notably, the Invoice expressly states, in part: "Sausage, Turkey Maple Link . . . ." *Id.* Payment was due by October 27, 2017. *Id.* And, the purchase requisition (*id.* at 4) indicates an "Item Description" of "Turkey Sausage Links." Further, the "Receiving Report" describes the "articles" as "Turkey Sausage links." *Id.* at 5.

Of relevance, all commercial vendors supplying inmate food items to ECI are explicitly informed prior to sale that any food items must not contain any pork or pork by-products, in accordance with DPSCS policies. *See* ECF 20-3, ¶6. Troxell avers that ECI relies on the commercial food vendors to comply with this policy. *Id.* Defendants also expect ECI staff to comply with Division of Correction Directives and ECI policies regarding inmate meals. *Id.* at ¶7; ECF 20-5 (Foxwell Declaration), ¶3.

Defendants do not dispute, however, that 12 of the 192 cases of "sausage that contained 2% or less dehydrated pork stock" were served to ECI inmates on October 25, 2017. *See* ECF 20-1 at 6.[2] Troxell states that once the sausage links were discovered to contain pork stock, they were not served again and the remaining 180 cases of the turkey sausage links were returned to the commercial vendor for credit. ECF 20-3, ¶9. The Bill of Lading business record reflecting the original order of 192 cases of turkey sausage includes a handwritten notation that 180 cases were returned. *See* ECF 20-2 at 6.

In their responses to defendants' Motion, plaintiffs assert that ECI correctional dietary officers had been aware that the sausages contained pork prior to serving them. *See* ECF 24 at 3-6; ECF 25 at 2; ECF 26. To support their assertion, all three plaintiffs attached as an exhibit a Notice of Incident/Matter of Record ("MOR") dated October 25, 2017, and completed by ECI correctional officer Sgt. T. Twilley. It states, ECF 24-1; ECF 26-1; ECF 28-1:

> On 10/25/17 I Sgt. T. Twilley CDO II reported for duty as East Dietary First Officer at 0750. At approximately 0825 Sgt. Farina CDO II reported for duty and I called for the AM dietary workers. As a couple of the workers arrived to work they asked if the sausage for breakfast was pork; I told them no it should not be, the warehouse/dietary does not get pork to serve to population, they said they were told by some of the PM workers it had pork in it, I again told them it could not be we don't get pork products of any sort to serve. The sausage for the seg line and part of the food line to start was cook [sic] that night. I went into the walk in to check

[2] Eggs were available upon request. ECF 20-1 at 6.

the labels there were no labels on any of the boxes, so I held firm they were turkey sausage. After the seg line had been completed I went to the back flipped over the back, there was a MOR with a sausage label on it. I took a fast look at the label and it said Turkey Sausage. I did not read the MOR or the label any more, the sausage were [sic] turkey. I was still asked by some of the kitchen workers if it was pork sausage I told them no it was turkey. After the second line went through, I was asked again. I was in the back with food service work getting product out. The 3rd line started and was about ½ or more through when I came out of the back. I at this time went into the office, to read Sgt. Riddick CDO's MOR. At this time of reading it I found that the item in the Turkey Sausage there was pork stock, I didn't read any more to see if it was natural . . . . I went to the front line only to find there were only approx 6-10 people left in the line. I spoke to some of the PM shift later and was told they had pointed it out to Sgt. Morris CDO II when the sausage came in and he acted as if he did not care, and stated they will eat it anyway. I don't know if he said this I was not there. On Friday 10/27/17 when Sgt. Riddick came back to work I asked her about it. She stated she wrote a MOR about it, and that she kept getting told because Sgt. Morris was told when the food service truck came in and did not care and would do nothing about it, and still had them pan the sausage up. She said when she asked him about it, he acted as they [sic] it did not matter and he did not care. This product should have never been sent into the compounds from the warehouse. The warehouse foods officer whom [sic] received the products from vendors should have caught this and never received this product.

On November 10, 2017, Ricks filed Administrative Remedy Procedure ("ARP") complaint ECI-2908-17, and on November 12, 2017, Bivens filed ARP complaint ECI-2927-17. ECF 20-2 at 7-8, 24-26. Both plaintiffs asserted that by serving pork at breakfast on the date in question, ECI staff violated their First Amendment right to practice their religion. *Id.* Both plaintiffs also stated that they became ill after consuming pork. *Id.* They sought, *inter alia*, monetary compensation. *Id.*

When responding to an ECI inmate's ARP complaint, Foxwell relies on the review and investigation by the staff. ECF 20-5, ¶4. During the investigation of plaintiffs' ARP complaints by ECI staff, a correctional officer assigned to the "feed up" meal duty for October 25, 2017, provided a statement indicating that, to the officer's knowledge, no pork products were purchased or served in the Division of Correction, that the food item in question was turkey sausage, and that eggs were available if any inmate wanted a substitute. ECF 20-2 at 35.

On November 28, 2017, Foxwell provided the following response to Bivens's ARP complaint, *id.* at 7:

> Your request for Administrative Remedy has been investigated and is Meritorious in Part; upon review of reports from staff and supporting documentation, it has been determined that sausage that contained 2% or less dehydrated pork stock on 10/25/17. This was served as an oversite [sic] by multiple departments and the vendor. This product has been pulled and will not be served in the future. Per the Chaplains [sic] office; not to eat pork is a religious preference. Eating of pork products does not cause health issues. Staff has been advised to check labels prior to serving.

Foxwell provided a similar response with regard to Ricks's ARP complaint on November 30, 2017. *Id.* at 24.

Both Bivens and Ricks appealed their respective ARP complaints, asserting that, pursuant to prison procedures, "no pork or pork products shall be purchased or served for inmate food services." *See id.* at 13-18; 29-30. The Commissioner of Correction dismissed both appeals, stating: "You were advised in the warden's response that staff has been advised to check labels prior to serving." *Id.* at 12, 28. The Commissioner also advised Bivens and Ricks that the relief or remedy they sought would not be provided. *Id.*

Thereafter, Bivens filed a grievance with the Inmate Grievance Office ("IGO"), Case No. 20180163, which was reviewed and dismissed on March 12, 2018. ECF 20-4 (Hassan Declaration), ¶3. Ricks also filed a grievance with the IGO, Case No. 20180162, which was reviewed and dismissed on July 18, 2018. *Id.* at ¶3. There is no record that Lee filed any ARP appeal regarding this incident with the IGO. *See id.* at ¶5.

## I.      Standard of Review

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner

implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed App'x 220, 222 (4th Cir. 2016) (per curiam). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 Fed. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018);

*Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). "This is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

None of the plaintiffs has filed an affidavit under Rule 56(d). With the exception of DPSCS, I am satisfied that it is appropriate to address the defendants' Motion as one for summary judgment, as this will facilitate resolution of the case.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 2019 WL 1105179, at *3 (4th Cir. Mar. 11, 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting

the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.,* 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). And, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or

assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs*., 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Notably, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Wilson v. Prince George's County*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

In sum, to counter a motion for summary judgment, there must be a genuine dispute as to material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986). "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law." *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).

Because plaintiffs are self-represented, their submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice"); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972)

(stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *Bala v. Cmm'w of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (same).

But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## II.   Discussion

In their Motion, defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(1) and (6), or summary judgment under Rule 56.   They argue that (1) Lee failed to exhaust his administrative remedies; (2) DPSCS is immune from suit in federal court pursuant to the Eleventh Amendment; (3) Foxwell and Troxell did not personally participate in the alleged wrongdoing; (4) no First Amendment violation occurred; (5) defendants are entitled to qualified immunity; (6) no due process violation occurred based on a violation of DPSCS's policies and procedures; (7) the consumption of pork was not cruel and unusual punishment; and (8) Lee is not entitled to preliminary injunctive relief.   ECF 20-1.

### A.  Eleventh Amendment

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any Foreign State."   The Eleventh Amendment did not create sovereign immunity.   Rather, it preserved the sovereign immunity that the states enjoyed prior to the formation of the Union.   *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011).

The preeminent purpose of state sovereign immunity is "to accord states the dignity that is consistent with their status as sovereign entities[.]" *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002). Thus, states generally enjoy immunity from suits brought in federal court by their own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984). In other words, under the Eleventh Amendment, a private individual is barred from bringing a suit against a state in federal court to recover damages, unless the state consents or there is an exception to sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 556 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *Edelman v. Jordan*, 415 U.S. 651 (1974).

In addition, absent waiver or a valid congressional abrogation of sovereign immunity, sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state." *See Pennhurst*, 465 U.S. at 101-02 ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). The DPSCS is an arm of the state. Md. Code (2017 Repl. Vol.) §§ 2-101, 3-201 of the Correctional Services Article ("C.S."); *see also Clarke v. Maryland Dep't of Pub. Safety and Corr. Servs.*, 316 Fed. App'x 279, 282 (4th. Cir. 2009) (stating

"the Maryland Department of Public Safety and Correctional services is undoubtedly an arm of the state for purposes of §1983"). Moreover, claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity, because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).

The Fourth Circuit has noted three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state. In *Lee-Thomas v. Prince George's Cty. Pub. Sch.*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

Neither the State of Maryland nor DPSCS has waived immunity in federal court for claims brought pursuant to § 1983. Nor do the exceptions outlined above apply here.

Accordingly, DPSCS is immune from suit and shall be dismissed. Foxwell and Troxell are also immune from suit for actions taken in their official capacities. As to actions taken in their individual capacities, the Complaint does not allege any individual acts or omissions on their part. In any event, plaintiffs' claims fail, as outlined in Section C, *infra*.

**B. Exhaustion**

Defendants raise the affirmative defense that plaintiff Lee has failed to exhaust his administrative remedies, as required by the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. The PLRA provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail,

prison, or other correctional facility until such administrative remedies as are
available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. App'x 253 (4th Cir. 2004).[3]

The doctrine governing exhaustion of administrative remedies has been well established through administrative law jurisprudence and provides that a plaintiff is not entitled to judicial relief until the prescribed administrative remedies have been exhausted. *Woodford v. Ngo*, 548

---

[3] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id.* at 651, 898 A.2d at 960 (citation omitted). Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Abramson v. Corr. Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," Md. Code, Corr. Servs. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

U.S. 81, 88 (2006) (citations omitted).  A claim that has not been exhausted may not be considered by this court.  *See Jones v. Bock*, 549 U.S. 199, 220 (2007).  In other words, exhaustion is mandatory.  *Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850, 1857 (2016).  Therefore, a court ordinarily may not excuse a failure to exhaust.  *Ross*, 136 S.Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

The PLRA's exhaustion requirement serves several purposes.  These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record."  *Bock*, 549 U.S. at 219; *see Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies).  It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process so that the agency reaches a decision on the merits.  *Chase*, 286 F. Supp. at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all

administrative steps to meet the exhaustion requirement so that the agency addresses the merits of the claim, but need not seek judicial review), *cert. denied*, 537 U.S. 949 (2002).

However, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Bock*, 549 U.S. at 215-216; *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford*, 548 U.S. at 88, 93. This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* at 93 (quoting *Pozo*, 286 F.3d at 1024) (emphasis in original). But, the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

Notably, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). The Fourth Circuit addressed the meaning of "available" remedies in *Moore*, 517 F. 3d at 725, stating:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford*

*v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id*. at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

More recently, in *Ross v. Blake*, *supra*, 136 S.Ct. 1850, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id*. at 1855. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id*. at 1856-57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id*. at 1855. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore,* 517 F.3d at 725.

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 136 S.Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id*. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

The DPSCS has an established ARP for use by Maryland State prisoners for "inmate complaint resolution." *See generally* C.S. §§ 10-201 *et seq*.; Code of Maryland Regulations

("COMAR") 12.07.01.01B(1) (defining ARP); OPS.185.0002.02.[4] The grievance procedure applies to the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance to include a "complaint of any individual in the custody of the Department of Correction [("DOC")] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." COMAR 12.07.01.01B(8). An inmate "must exhaust" the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D; OPS.185.0002.02.

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the IGO against any DOC official or employee. C.S. § 10-206(b). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process, before filing a grievance with the IGO. *See* C.S. § 10-206(b); *see also* OPS.185.0002.02. A grievance must be filed in writing, in a format approved by the IGO, or by use of an ARP form. COMAR 12.07.01.04(A). And, the grievance must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.07.01.05A.

---

[4] OPS.185.0002 is an Executive Directive created by DPSCS, titled "Administrative Remedy Procedure (ARP)" ("ARP Directive") available for review at http://itcd.dpscs.state.md.us/PIA. "[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015); *see also* Fed. R. Evid. 201(b)(2) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official" OPS.185.0002.05C(1). In C.S. § 1-101(k), a "managing official is defined "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." In the DPSCS, each facility's warden is responsible for the ARP at the institutional level. OPS.185.0002.05E. Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. OPS.185.0002.05J.

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP. The prisoner has 30 days to file an appeal with the DPSCS's Deputy Secretary for Operations or that official's designee. OPS.185.0002.05L. For prisoners in DOC facilities, the Commissioner of Correction is the official to whom this appeal is sent. *Id.*

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO. OPS.185.0002.05D; C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B. When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B.

An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of

Administrative Hearings. *See* C.S. § 10-208(2)(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07D; *see also* Md. Code Ann., State Gov't §§ 10-101 *et seq.*

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(i) & (ii); COMAR 12.07.01.10A. However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-209(b)(2), (c).

The final agency determination is subject to judicial review in a Maryland circuit court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. An inmate need not, however, seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement. *See, e.g., Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

Lee failed to exhaust his administrative remedies regarding the claim asserted here. Pursuant to COMAR 12.07.01.05A, a grievance must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. In his opposition to defendants' Motion, Lee asserts that the remedy procedure is a "dead end due to the officers unwilling [sic] to provide relief or any type of remedy" and therefore he did not forfeit his right to raise this claim. ECF 27 at 4-5. This bald assertion, however, does not excuse his failure to file a grievance.

As discussed above, the PLRA requires that inmates exhaust all available remedies properly. The complete ARP process was available to Lee but it appears that he elected not to pursue it. Thus, Lee's claim is subject to dismissal for failure to exhaust.

Even if Lee had exhausted, however, his claim, as outlined below, fails.

### C. The Merits of the Claim

To be sure, prisoners retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974) and *Cruz v. Beto*, 405 U.S. 319 (1972) (per curiam)). Therefore, prisoners must be afforded "reasonable" opportunities to practice their religion. *Cruz*, 405 U.S. at 322. This includes the "right to a diet consistent with [the inmate's] . . . religious scruples." *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003). A prison official violates this right if he intentionally, and without adequate justification, denies an inmate a diet that is religiously mandated. *Lovelace v. Lee*, 472 F.3d 124, 199 (4th Cir. 2006).

However, only intentional conduct is actionable under the Free Exercise Clause of the First Amendment. *Lovelace*, 472 F.3d at 201. The Fourth Circuit has held that "negligent acts by officials causing unintended denials of religious rights do not violate the Free Exercise Clause." *Id.* Therefore, a plaintiff "must assert conscious or intentional interference with his free exercise rights to state a valid claim under § 1983." *Id.* Similarly, an official's negligent act does not implicate the Due Process Clause. *Id.*

Here, plaintiffs assert that at least one correctional dietary officer, Sgt. Morris, was aware that the sausages contained pork but nonetheless chose to send them to the kitchen to be served the following morning. *See* ECF 24 at 3-6; ECF 25 at 2; ECF 26. Defendants do not dispute that, as a result, "sausage that contained 2% or less dehydrated pork stock" was served to ECI inmates

on October 25, 2017.  *See* ECF 9-1 at 3-4.  But, they have amply demonstrated that ECI staff ordered and intended to purchase turkey maple sausage links from a commercial food vendor. ECF 9-2 at 2-4.  Moreover, the vendor was explicitly informed prior to sale that food items may not contain any pork or pork by-products, in accordance with DPSCS policies.  ECF 9-3, ¶6.  And, as Troxell explained, ECI relies on the commercial food vendors to comply with this policy with respect to the inmate food items supplied to ECI.  *Id.*  Unexpectedly, and contrary to the purchase order that had been placed, the vendor provided sausage with pork in it.

Although Sgt. Morris may have, in fact, decided to send the sausages to the kitchen with the knowledge that they contained pork, the exhibit presented by plaintiffs indicates that Sgt. Riddick acted almost immediately to correct the situation by completing a MOR to notify the morning dietary staff.  ECF 24-1, 26-1; 28-1.  And, despite not promptly finding Sgt. Riddick's MOR and reading the fine print on the sausage labels, Sgt. Twilley immediately stopped serving the sausages once he discovered that they contained pork stock.  *Id.*  Indeed, the sausage product was not served again and the remaining 180 cases of turkey sausage links were returned to the commercial vendor.  ECF 20-3, ¶9.  The named defendants also sought to correct any such error in the future by advising staff, going forward, "to check labels prior to serving."  *See* ECF 20-2 at 7, 24.

In sum, there is no dispute of material fact.  The evidence, construed in the light most favorable to plaintiffs, shows that DPSCS does not order pork sausages for inmates.  ECF 20-3, ¶ 31.  Rather, it orders turkey sausages.  ECF 20-2 at 3.  However, an isolated incident occurred on October 25, 2017, when sausage containing a small percentage of pork was mistakenly delivered by the vendor to ECI and served at breakfast.  But, plaintiffs never requested a Halal diet.  ECF 20-3, ¶ 5.  On these facts, there was no First Amendment violation.  *See Johnson-Bey v. Indiana*

*Dep't of Corr.*, 668 F. Supp. 2d 1122, 1129 (N.D. Ind. 2009) (holding that a single instance of being fed pork cannot support a claim that inmates were denied their First Amendment right to freedom of religion or a claim that the food service personnel violated the Fourteenth Amendment's equal protection clause); *accord Johnson v. Varano*, No. 714 C.D. 2010, 2011 WL 10843816, at *6 (Pa. Commw. Ct. Mar. 9, 2011) (stating that "a single incident of being inadvertently served pork does not deprive [an inmate] of the right to the free exercise of his faith").

### D. Conclusion

Suit against DPSCS shall be dismissed. No genuine issue as to any material fact is presented and defendants Foxwell and Troxell are entitled to judgment as a matter of law.[5]

A separate Order follows.


October 31, 2019                                   _____/s/_____
Date                                                        Ellen L. Hollander
                                                                 United States District Judge

---

[5] In light of the disposition, it is not necessary to address defendants' remaining arguments.